IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA | Hon. Jerome B. Simandle |
| v. | Criminal No. 08-482 (JBS) |
| ALFRED P. AVASSO, | |
| Defendant. | **OPINION** |

APPEARANCES:

> PAUL J. FISHMAN
> United States Attorney
> By: R. STEPHEN STIGALL
> Assistant U. S. Attorney
> OFFICE OF THE US ATTORNEY
> 401 Market Street, 4th Floor
> Camden, NJ 08101
>
> MICHAEL N. HUFF, Esq.
> 1333 Race Street
> Philadelphia, PA 19107
> Attorney for Defendant

SIMANDLE, U.S. District Judge:

On July 11, 2008, defendant Alfred P. Avasso appeared before this Court and entered a plea of guilty to a one-count Information for the crime of conspiracy to engage in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1956(h). His plea agreement was memorialized in a written document dated July 18, 2007 (Ex. C-1 on 7/11/08) and in a cooperating plea agreement also dated July 18, 2007 (Ex. D to Gov't Opp. Br.), which he had reviewed with two different lawyers and indeed signed twice. On the eve of sentencing, after a

lengthy period of proffer sessions and efforts to cooperate, and after receipt of the Probation Department's Presentence Investigation and Report, Avasso has moved, through his third attorney, to withdraw his plea of guilty pursuant to Rule 11(d)(2)(B), Fed. R. Crim. P.  In support of his motion, defendant asserts three grounds, namely, (1) that his plea was not knowing or voluntary because he was threatened by federal investigators, (2) his prior counsel was ineffective in advising him to plead guilty, and (3) he is innocent of the crime to which he pled guilty.

The Court convened a hearing on September 16, 17, 20 & 21, 2010, received documentary and testimonial evidence from both sides, and has considered the submissions and arguments of counsel.  With the benefit of hearing live testimony and making various determinations of credibility and weight, the Court will deny defendant's motion for the following reasons.

## I.   PROCEDURAL HISTORY

In 2007, the defendant and the government entered into two written plea agreements, each dated July 18, 2007.  In the agreement, the defendant agreed to plead guilty to one count of conspiracy to commit money laundering contrary to 18 U.S.C. § 1957 and in violation of 18 U.S.C. § 1956(h).  In exchange for Mr. Avasso's agreement to plead guilty to 18 U.S.C. § 1956(h),

2

the government agreed not to initiate any further criminal charges against the defendant, including conspiracy to conduct monetary transactions in criminally derived property (securities and wire fraud), conspiracy to manipulate the price of securities, and concealing the ownership and proceeds from the sale of securities. Mr. Avasso, however, agreed to be held responsible for the above as relevant conduct under U.S.S.G. §§ 1B1.3 and 1B1.2(c). Mr. Avasso and his first attorney, Gavin W. Scotti, Esquire executed the agreement on September 4, 2007, but the plea was not entered in court. Thereafter, Christopher H. O'Malley, Assistant Federal Defender's Office was assigned to represent Mr. Avasso in April 2008, at Defendant's request.

On July 11, 2008, Mr. Avasso appeared in the United States District Court for an initial appearance. At that hearing, Mr. Avasso waived indictment (Docket Item 2) and entered into a guilty plea to an Information (Docket Item 1), charging him with violating 18 U.S.C. § 1956(h). Mr. Avasso completed the Application for Permission to Enter Plea of Guilty (Ex. C-2 on 7/11/08). Mr. Avasso re-signed and Mr. O'Malley signed the July 18, 2007 plea agreement in open court on July 11, 2008. (Tr. 7/11/2008 at 19-20.)

During the lengthy and detailed Rule 11 hearing on July 11, 2008, Mr. Avasso acknowledged that he read the charges against him in the Information and discussed them with his attorneys (Tr.

3

7/11/08 at 10:15-17; 13:9-22), that he understood the maximum penalties he faced in the event he chose to plead guilty (id. at 10:21 to 13:8); and that indeed the charge contained in the Information was the same as the charge to which he had decided to plead guilty while represented by prior counsel, Mr. Scotti, in 2007 (id. at 14:18 to 15:2). He acknowledged that he had discussed with counsel the pluses and minuses of pleading guilty versus going to trial (id. at 15:3-9), and that he has personally made the choice to plead guilty as his own decision (id. at 15:10-20). Regarding pleading guilty of his own free will, and contrary to his new claim of being threatened, Avasso gave these answers under oath on July 11, 2008:

> THE COURT: And so in a very real sense you have the choice to make of whether to plead guilty or whether to go to trial.
>
> THE DEFENDANT: I've made that choice, your Honor.
>
> THE COURT: Is it your own personal choice?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Are you pleading guilty of your own free will?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Has anyone forced you to plead guilty?
>
> THE DEFENDANT: No, your Honor.

(Id. at 15:15-25.)

4

He acknowledged filling out and reading and understanding the plea application (id. at 16:9-20).  Contrary to his new claim that Mr. O'Malley provided ineffective assistance, he testified he was "very satisfied" with the services and efforts of Mr. O'Malley and the Federal Public Defender on his behalf.  (Id. at 17:11-13.)

Contrary to his present claim of never having read his plea agreement letters, Avasso testified on July 11, 2008 that he read the letters and had gone over them with Mr. O'Malley in detail. (Id. 17:15 to 21:4.)  He read, understood, and accepted the stipulations attached to his plea agreement, and he testified they were true and correct.  (Id. at 18:4-24.)

Avasso acknowledged signing his plea agreement letters with prior counsel Gavin Scotti, Esq., on September 4, 2007, and he signed them again in open court with Mr. O'Malley.  (Id. at 18:25 to 20:7.)

Contrary to his current claim of being unfamiliar with his responsibilities under the cooperating plea agreement, Avasso testified on July 11, 2008 that he understood and accepted the requirements of his cooperating plea agreement (id. at 20:12 to 21:7).

At the guilty plea hearing, the Court also engaged in dialog with Avasso that demonstrated that Avasso knew and voluntarily waived his constitutional rights (id. 21:5 to 23:14) and that his

5

plea of guilty results in "a finding of guilt with the same force and effect as if a jury found [him] guilty after a trial." (Id. at 23:15-20.)

Regarding the finality of his admission of guilty, and contrary to his current assertion of innocence, Avasso testified as follows in 2008:

> THE COURT:  Do you also realize that a plea of guilty is an acknowledgment of your guilt.  So, as a factual matter, you could never come back to this Court or some other court and say that you really weren't guilty of the things you are pleading to.  Do you understand that?
>
> THE DEFENDANT:  Yes, your Honor.
>
> THE COURT:  In other words, are you prepared to admit your guilt to these charges?
>
> THE DEFENDANT:  Yes, your Honor.

(Id. at 23:21 to 24:5.)  Avasso explicitly acknowledged his understanding of the finality of his guilty plea and his inability to thereafter change his mind or claim lack of knowledge of the consequences of his decision.  He testified that if his guilty plea was accepted by the court, he could never come back another day and say, "Judge, I changed my mind, I don't want to plead guilty anymore; or, Judge, I didn't know what I was doing on July 11th when I entered that plea."  (Id. at 9:7-14.)

The Court then went over the presentence and sentencing procedures with Mr. Avasso at some length,[1] which he understood and still desired to plead guilty.  (<u>Id.</u> at 24:6 to 31:7.)

Especially pertinent to Avasso's current profession of innocence are the factual basis questions that he answered under oath in 2008.  The Court asked questions regarding the factual basis of his crime that had been suggested in writing by the Assistant U.S. Attorney.  Mr. Avasso testified that he read these questions ahead of time with Mr. O'Malley and that he was prepared to answer them truthfully.  (<u>Id.</u> at 31:8-21.)  He indicated he had carefully read the charge and was guilty of the offense.  (<u>Id.</u> at 31:22 to 32:2.)  He affirmatively answered all questions establishing his participation in the criminal conspiracy to which he pled guilty.  (<u>Id.</u> at 32:3 to 36:25.)  His answers included factual admissions of guilt to the very acts from which he now attempts to distance himself.   (<u>Id.</u>)

Other matters, not presently relevant, were then covered, including his understanding of provisions of his plea agreement waiving appeal and post-conviction relief rights under certain conditions.  (<u>Id.</u> at 37:1 to 42:11.)  Thereafter, Avasso again affirmed he still wished to plead guilty (<u>id.</u> at 42:12-14) and the Court accepted his plea, finding all requirements of Rule 11

---

[1] Defendant Avasso does not claim that he did not understand the sentencing jeopardy and the sentencing procedures that would be applied in his case.

7

were satisfied.  (id. at 42:15-22), before turning to questions
of release on bail.

Sentencing was originally set for about three months later,
on October 10, 2008 (id. at 42:23), but the sentencing date was
adjourned several times on joint request of counsel to enable
defendant to attempt to further cooperate with the government in
its investigations of others.  He had been cooperating since
2006, long before entering his guilty plea in 2008.

On December 28, 2009, the Probation Office issued its draft
PSR, and after further back-and-forth with the attorneys, the
final PSR was issued April 7, 2010.  That report recites an
advisory Sentencing Guideline range of 188-235 months of
imprisonment, with Avasso's statutory exposure capped at 120
months of imprisonment, the maximum under his single count of
conviction under 18 U.S.C. § 1956(h).  By the time Avasso wrote
to the Court seeking to withdraw his guilty plea in April, 2010,
he was certainly given to understand that he faced an all-but-
certain prospect of imprisonment, perhaps for a lengthy term.

It was around the latter date that Mr. Avasso wrote a letter
directly to the Court, received on April 6, 2010, indicating he
wanted to change his plea and that he wanted a new attorney due
to irreconcilable differences with Mr. O'Malley.  The Court
forwarded Avasso's ex parte communication to all counsel (Docket
Items #11 & 12), and convened a hearing on April 19, 2010, where

8

new counsel would be appointed from the Criminal Justice Act
list, resulting in the appearance of Michael Huff, Esq., for
defendant.  At the status conference on May 6, 2010, Mr. Huff
requested and received 90 days to investigate, prepare, and file
any motion to withdraw the plea (Docket Item 17.)

The present motion was filed August 6, 2010 (Docket Item 21)
and heard on various dates in September, 2010.  Defendant Avasso
testified on his own behalf, and he called Sheldon Friedland as a
witness.  The United States called Steven Wahrman, FBI Special
Agent John Mesisca, and former defense counsel Christopher
O'Malley as witnesses.


## II.  STANDARDS FOR WITHDRAWAL OF GUILTY PLEA UNDER RULE 11(d)(2)(B)

Under Rule 11(d)(2)(B), "A defendant may withdraw a plea of
guilty or nolo contendere ... after the court accepts the plea,
but before it imposes sentence if ... the defendant can show a
fair and just reason for requesting the withdrawal."  When faced
with such a motion, the court must consider three factors:  (1)
whether the defendant asserts his innocence; (2) the strength of
the defendant's reasons for withdrawing the plea; and (3) whether
the government would be prejudiced by the withdrawal.  United
States v. Jones, 336 F.3d 245, 252 (3d Cir. 2003); United States
v. Brown, 250 F.3d 811, 815 (3d Cir. 2001); United States v.
Sgarlat, 2010 WL 1380254, at *3 (D.N.J. Mar. 31, 2010).

9

Defendant bears the burden of demonstrating such a "fair and just reason," and that burden is "substantial." Jones, 336 F.3d at 252; United States v. Isaac, 141 F.3d 477, 485 (3d Cir. 1998). The Supreme Court has noted that it would debase the judicial proceeding if withdrawal of a guilty plea were automatically granted "[a]fter the defendant has sworn in open court that he actually committed the crimes, after he has stated that he is pleading guilty because he is guilty, after the court has found a factual basis for the plea, and after the court has explicitly announced that it accepts the plea." United States v. Hyde, 520 U.S. 670, 676 (1997).

Thus, it is clear that "[r]easons that fail to meet a defendant's burden include 'a shift in defense tactics, a change of mind, or the fear of punishment.'" Jones, 336 F.3d at 252 (quoting Brown, 250 F.3d at 815, quoting United States v. Jones, 979 F.2d 317, 318 (3d Cir. 1992)).

Where a defendant asserts innocence as a basis for withdrawal, directly contradicting his sworn admissions of a factual basis of guilt, such a complete contradiction of prior testimony deserves special scrutiny. The Seventh Circuit has held that it is within the District Judge's discretion to elect to treat freely given sworn statements of guilt as "conclusive." United States v. Stewart, 198 F.3d 984, 987 (7th Cir. 1999). Where the defendant credibly asserts his innocence and identifies

10

circumstances that had unfairly or unjustly led him to admit guilt, the motion should be granted and the plea withdrawn.

## III.   DISCUSSION AND ANALYSIS

### A.   Whether Defendant was Coerced to Plead Guilty

Mr. Avasso claims that he pled guilty to crimes he did not commit because the FBI agents coerced him.  He claims that during his initial encounter with Special Agents of the FBI while he was being interviewed at a diner in October, 2006, he was threatened with the arrest of his wife if he didn't talk.  He gave a lengthy statement describing his criminal involvement in the Accident Prevention Plus (APP) securities fraud and money laundering scheme that the agents were investigating, the essence of which was stated in the FBI's Form 302 initialed by Special Agents John J. Mesisca and Dereck Altieri.

Avasso testified he received a phone call from Special Agent Mesisca and agreed to meet with him that day at a diner in Smithtown, Long Island, New York.  (Avasso Cert. ¶¶ 127-128.)  He said that the agents began asking him "accusatory questions about APP," and that when he asked them if he needed an attorney, they replied that he did not; he now claims that "they told me that they knew my wife was at home and that they would go to my home and question and implicate her and go to my daughter's place of

11

business and that they would be questioned and implicated." (<u>Id.</u> ¶¶ 129-131.)

Avasso claims: "I feared the FBI trying to implicate my wife and daughter (who I knew were also innocent) and told them that I would admit to anything if they would not bother my family." (<u>Id.</u> ¶ 132.) Overall, Avasso now claims: "The only reason I admitted to wrongdoing with the agents was out of duress and intimidation." (<u>Id.</u> ¶ 133.)

Testifying before this Court on September 17, 2010, Avasso's testimony was more vivid, basically saying that the oath he took to tell the ruth in his Rule 11 hearing on July 11, 2008, "meant nothing" because "I felt I had a gun to my head" by the FBI's threats to prosecute his wife. "The oath meant nothing to me" because he felt he should say anything to protect his wife and daughter.

In rebuttal, Special Agent Mesisca testified to the initial encounter and other aspects of Avasso's dealings with the FBI. Agent Mesisca and others, including the IRS, had conducted a detailed investigation of APP and its alleged contractors such as Bristol which Avasso had set up. The agents had interviewed APP's founder (Goodhart), as well as its president and board member Steven Wahrman, and its vice-president for finance (Charles Carus), and others, all of whom had implicated Avasso and, to varying degrees, themselves in the scheme. The agents

12

had reviewed various corporate records, book records, and brokerage analyses before deciding to interview Avasso. By the time Agent Mesisca called him, Avasso was aware of the existence of the investigation and was not surprised to receive the call.

According to his testimony, Special Agent Mesisca arrived at the diner with Special Agent Altieri, took a seat, and waited about ten minutes. Avasso appeared, walked toward their booth, and even as he was sitting down, proclaimed he wanted to cooperate and, as a convicted felon,[2] he knew what to do. Avasso was so loud in the public restaurant that the agents had to advise him to speak more softly as the interview continued. Avasso answered all their questions, implicated himself and gave details of his criminal conduct, as summarized in the agents' contemporaneous report. (Ex. JM-J-1, dated 11/7/06.) According to Agent Mesisca's testimony, and as memorialized in the agents' report, Avasso freely said, "what I did was 100% wrong according to the law. I should rightfully go to jail." (Id.) The agents

---

[2] Avasso has two prior federal felony convictions. The first was for mail fraud and false statements in the Eastern District of New York where he was sentenced in 1987 to two years imprisonment, later reduced to probation in 1988 (PSR ¶ 153.) The second was for conspiracy to commit wire fraud and commercial bribery in connection with publicly traded securities in the Southern District of New York, for which he received a probationary sentence of two years in 1998. In both cases, his sentence was impacted by his cooperation with federal prosecutors in investigations of others. In short, on the two prior occasions when he faced federal fraud charges, he pleaded guilty, assisted the government as a cooperator, and served no time in prison. He decided in 2006 to embark on this same course.

never threatened Avasso to encourage his confession or guilty plea.  To the contrary, Avasso volunteered to cooperate from the beginning, and he alluded to his prior cooperation with the Postal Inspection Service in New York.  In other words, as Special Agent Mesisca testified, "he wanted to help himself."

The agents specifically never said that they would go to Avasso's home and interview his wife, Rita, because they knew no one was at home since they had just stopped there looking for Avasso before calling him.  Avasso discussed his wife's and daughter's roles, however, because he admitted he used his wife's name in some of the stock transfers and his daughter's account to deposit some of the illegal proceeds, without their knowledge.

Moreover, there was nothing coercive about the initial interview.  Avasso agreed to the location in the public diner, he was not under arrest, no weapon or show of force was displayed, and his demeanor was clearly that of a man making his own assessment and decision about what was best for him.

The Court finds that Mr. Avasso's claim of being threatened with the prosecution of his wife and daughter was a fabrication. No such threats were made.

Mr. Avasso proceeded to hire an attorney in New York (Mr. Scotti) and participated in further proffer sessions with the

agents and his attorney pursuant to a proffer agreement.[3]  He
wanted to plead guilty and his attorney negotiated a favorable
plea agreement to a single money laundering conspiracy count that
capped his exposure to ten years' imprisonment.  He made no
complaint of coercion to the FBI or U.S. Attorney's Office.

Although he now claims that prior to his Rule 11 hearing he
told his second attorney -- Mr. O'Malley -- that he was being
forced to plead guilty, Mr. O'Malley's testimony, which this
Court fully credits, was to the contrary.  The subject of threat
or coercion by the governmental agents never came up in the
communications between Avasso and O'Malley prior to the Rule 11
hearing in 2008.  Indeed, as described by Special Agent Mesisca
and by Mr. O'Malley, Avasso's proffer sessions with the
prosecution team on November 21, 2006 and May 9, 2007 were
cordial and Avasso freely admitted his actions were illegal.
Avasso and the agents spoke freely back and forth as part of the
cooperation and assistance Avasso attempted to provide.  Mr.
O'Malley's testimony confirmed that Avasso never mentioned FBI
threats to him before pleading guilty.  Defendant's first mention
of any FBI threats occurred months after the guilty plea, in
November 2008 and on a few occasions in 2009.  As Mr. O'Malley

---

[3] Avasso's efforts to cooperate over the years are addressed
more fully in U.S. Mem. in Opposition, at 21-26, which efforts
were further confirmation of his participation in the scheme and
his knowledge of its particulars.

testified on re-direct, he perceived Avasso's rendition of FBI threats as fantastical and not to be taken seriously.  The Court agrees.

Mr. Avasso's other alleged incident of coercion arises from a call he says he received from Special Agent Mesisca a week or two before the guilty plea hearing in 2008.  Avasso now contends that the call itself constituted a "veiled threat," to induce him to plead guilty.  This incident requires little comment because it is another fabrication.  Avasso already had a cooperating plea agreement, had met with the agents, and conducted proactive work such as wearing a wire, and had occasional conversations back and forth with the agents, as is customary for one who seeks to cooperate in the investigation of others.  There's nothing unusual about this contact from Special Agent Mesisca, and Avasso recalls none of the actual conversation that he regarded as coercive.  (His certification is altogether silent on this incident.)  Special Agent Mesisca testified that he never called Avasso before his guilty plea hearing to make sure he would plead, let alone to deliver some threat.  While he says he could have spoken with him about logistics, he didn't imply any threat.  The Court credits Mesisca's testimony, which is buttressed by Avasso's relaxed demeanor at the subsequent Rule 11 hearing and by Avasso's failure to have made any mention of this alleged incident to Mr. O'Malley.

16

The Court finds there is no truth to Mr. Avasso's claim that the FBI coerced his confessions and his guilty plea by threatening to prosecute his wife and daughter if he didn't confess and plead guilty.  His plea was entered, as he stated under oath on July 11, 2008, of his own free will, without threats or coercion from any governmental source.

**B.   Whether Prior Counsel Were Ineffective in Advising Defendant to Plead Guilty**

Mr. Avasso claims he received ineffective assistance from his two prior counsel and his plea of guilty was not knowingly and voluntarily entered.  "A court will permit a defendant to withdraw a guilty plea based on ineffective assistance of counsel only if (1) the defendant shows that his attorney's advice was under all the circumstances unreasonable under prevailing professional norms, [United States v.] Day, 969 F.2d at 42 (citing Strickland v. Washington, 466 U.S. 668, 687-91 (1984); and (2) the defendant shows that he suffered 'sufficient prejudice' from his counsel's errors.  Day, 969 F.2d at 45." United States v. Jones, 336 F.3d 245, 253-54 (3d Cir. 2003).

Mr. Avasso claims that his first attorney, Mr. Scotti, advised him to plead guilty, and that going to trial would be too expensive.  He claims Scotti never explained the plea agreement but simply told him to sign it.  He alleges his second attorney, Assistant Public Defender O'Malley, did not discuss the possible

17

defenses Mr. Avasso would have at trial, did not provide him with copies of the government's discovery, and "simply told him to plead guilty and answer yes to all of the judge's questions," while he disregarded Avasso's claims of innocence and that he did not want to plead guilty. Def. Memorandum of Law at 6-7. Avasso believes he "was simply herded through the process." Id. at 7.

In his testimony in support of this withdrawal motion, Avasso further claimed that, although he twice signed the written plea agreement and cooperation agreement letters, he never read them nor were they read to him.

Far from being "herded through the system," Avasso received the benefit of effective counsel spread over almost two years' time before his July 2008 guilty plea was entered. He retained and began meeting with Mr. Scotti after he had given his confession to the FBI agents at the diner in October of 2006. He attended proffer sessions with Scotti, who negotiated a cooperating plea agreement with the government for him dated July 18, 2007, which he signed seven weeks later on September 4, 2007, witnessed by Mr. Scotti, the same as the separate cooperation agreement. When his funds for private counsel ran out, he requested the Court to appoint the Federal Public Defender pursuant to the Criminal Justice Act. (See Order entered at Misc. No. 08-49 on April 23, 2008.) AFPD O'Malley counseled Avasso for the next three months preparing for the Rule 11

18

hearing that occurred on July 11, 2008.  This case presents an extraordinary circumstance whereby Avasso and his attorneys had the proposed plea agreement in hand for a year before coming to court.  This was the opposite of a last-minute, high-pressure plea agreement.

It was clear from Avasso's testimony at the Rule 11 hearing that he read the charges in the one-count criminal information; that Mr. O'Malley went over the maximum penalties "in detail;" that he discussed the charge with each of his attorneys, including "very detailed" discussions with Mr. O'Malley; that he had enough time with Mr. O'Malley to discuss what to do about this charge, including discussing "the pluses and minuses of pleading guilty versus going to trial"; that he understood he had a choice between pleading guilty and going to trial, which was his "own personal decision"; that Mr. O'Malley explained and Avasso filled out the application for permission to plead guilty, marked Ex. C-2, which he read, understood, and signed; and that he was "very satisfied" with the services and efforts of Mr. O'Malley and the Federal Public Defender on his behalf.  (Tr. 7/11/08 at 10-17.)

Mr. Avasso testified in 2008 that he read his plea agreement letter, went over it with Mr. O'Malley, went over the stipulations attached to it in Schedule A, understood the plea agreement including the stipulations, and accepted the

19

stipulations because they are "true and correct."  (Id. at 17-18.)

He also testified in 2008 that he understood the requirements of his cooperating plea agreement and he signed both agreements a second time in court on July 11th.  (Id. at 20.)

Mr. O'Malley, in his representations to the Court on July 11, 2008 (id. at 3-8), confirmed that all these discussions and preparations had occurred with Avasso and that he was satisfied that Mr. Avasso's decision to plead guilty was knowing and voluntary.  Likewise, at the hearing on this motion to withdraw on September 20, 2010, Mr. O'Malley was called upon to testify.[4] Mr. O'Malley's testimony confirmed he went over the proposed plea agreement with Avasso, who read the agreement.  O'Malley advised that he thought the agreement negotiated by prior counsel was favorable since it contained only the one-count conspiracy charge and the prospect of a sentence reduction for cooperation under U.S. Sentencing Guidelines § 5K1.1.  He spent about an hour going through the plea agreement with Avasso, as well as reviewing the

---

[4]  The Court, in its Memorandum Order filed Sept. 9, 2010 [Docket Item 24], found that Defendant waived the attorney-client privilege with regard to each claim of ineffective assistance of counsel as to all matters pertaining to discussions with the attorneys whose advice and conduct he alleges to be ineffective, citing, inter alia, United States v. Garba, 285 F. Supp. 2d 504, 509 n. 3 (D.N.J. 2003), aff'd, 128 Fed. App'x 855 (3d Cir. 2005); Laughner v. United States, 373 F.2d 326, 327 (5th Cir. 1967); United States v. Davis, 583 F.3d 1081, 1090 (8th Cir. 2009). Accordingly, Mr. O'Malley was free to testify to these matters.

application form.  Mr. O'Malley also confirmed that Avasso desired to continue his cooperation, and he stated that Avasso was adamant to move forward.  When O'Malley would speak with Avasso about defenses on tactics other than pleading guilty, as is his routine, Avasso would cut him off.

Likewise, Mr. O'Malley gave him a sober assessment of his sentencing risks as a thrice-convicted felon as well as the benefits of truthful cooperation, all of which Avasso understood.

Several observations are in order.  First, Avasso's decision to confess and spell out many of the details of his criminal scheme came before he ever had an attorney.  His damage, as it were, was self-inflicted in the initial FBI interview where he confirmed, in his answers to the FBI's open-ended questions (as Special Agent Mesisca testified), that he was deeply involved in the securities fraud and money laundering under investigation. His first attorney, Gavin Scotti, Esq., was confronted with this damning circumstance, as well as with Avasso's adamant desire to get a good plea bargain through cooperation, from the beginning.

Second, Mr. Avasso is not telling the truth about his critique of his attorneys.  He was in fact fully knowledgeable about his plea agreement and cooperation agreement, which he read, understood, and signed not once, but twice before entering his guilty plea.  The notion that Mr. O'Malley told him to answer yes to whatever he was asked by this Court is untrue, as Mr.

O'Malley confirms.  Mr. O'Malley prepared him for the Rule 11 hearing, as all competent counsel must do, by previewing the questions the Court would be asking, including the factual basis questions.

Third, counsel assisted him in making an informed decision about waiving his rights and choosing to plead guilty.

Fourth, Avasso has entered pleas of guilty in federal court on two previous occasions and knew fully what he was doing.  He also does not impress as a weak individual or one who would plead guilty just because his attorney so advised him.  He had a year to decide whether to enter his plea or go to trial.

Fifth, regarding his claim of ignorance of the government's case, the documents the government shared with Mr. Scotti and Mr. O'Malley were shared with Avasso, who was aware of the strong case against him developed from the records and statements of fellow participants.  As Mr. O'Malley testified, the defendant was aware of the prior discovery both through Mr. Scotti and from Mr. O'Malley.

Most importantly, upon these facts Avasso has not demonstrated that the advice of his attorneys was unreasonable under prevailing professional norms, as required by <u>Day</u> and other precedents, <u>supra</u>.

Moreover, he has not shown that counsel's conduct caused substantial prejudice.  For example, he alleges that he didn't

see many of the government's reports and documents until May, 2010, and if he had seen them before entering his plea, he would have decided to mount a defense.  This does not follow from these documents which, according to Special Agent Mesisca, constitute a mountain of corroborating evidence against him, gathered from witnesses, bank records, and business records.  In response to questions at the withdrawal motion hearing, Mr. Avasso could not demonstrate how this discovery would have raised reasonable doubt of his guilt or provided the basis for a defense, nor have current defense counsel's arguments done so.  This is the opposite of a circumstance in which the government has a weak case yet lures the defendant into a plea agreement.

Mr. Avasso, from his first encounter with the FBI, well understood that they were onto his scheme and that he could help himself by giving truthful cooperation.  His attempt to blame his attorneys for his choices simply has no merit.  In summary, Defendant Avasso has failed to prove counsel were ineffective in representing him in this case.


C.   **Whether Defendant's Claim of Innocence Presents a Just Reason to Withdraw his Guilty Plea**

Mr. Avasso now claims he was innocent of the crime to which he admitted guilt, and that he lied to the Court throughout the Rule 11 hearing on July 11, 2008.  He says he did not conspire with Mr. Goodhart, Mr. Wahrman, Mr. Carus, and others to

23

manipulate the price of APP stock, or to engage in monetary transactions in criminally derived property, namely, the proceeds of the APP securities fraud.  (Def. Memorandum of Law at 4.)  He also says that his contract between Bristol Consulting and APP was not fraudulent because Bristol Consulting did, in fact, provide services in addition to fund raising to APP as outlined in Mr. Avasso's certification.  (Id. at 5.)  According to Avasso, these legitimate services included providing financial and corporate advice, the formation of corporations as part of APP's corporate structure, travel to advance APP and its "black box" product, and other things.  (Id. at 5.)  In support of his profession of innocence, he submitted his own certification and testimony, together with the certification of Jeffrey Pearlman, CPA (Docket Item 21-1), and the certification and testimony of Sheldon Friedland (Docket Item 21-2), and the certification of attorney Michael Wernick (Docket Item 21-3).  His evidence includes affidavits that he prepared for signing by Goodhart, Jean-Paul Daveau and Wahrman in November, 2001 (Exs. D-2, 3 & 4), purporting to identify debts owed by APP to Bristol Connecting that would be paid in stock.  The signers, such as Wahrman, have disclaimed that these documents were true or accurate.

Under Rule 11(d)(2)(B), "once a defendant has pleaded guilty, he 'must then not only reassert innocence, but give sufficient reasons to explain why contradictory positions were

24

taken before the district court and why permission should be given to withdraw the guilty plea and reclaim the right to trial.'" <u>Jones</u>, 336 F.3d at 252-253 (citing <u>Jones</u>, 979 F.2d at 318).

Previously, in his confession and counsel-assisted proffers to the FBI and in his plea colloquy with this Court, Avasso admitted his role in the APP securities fraud conspiracy and money laundering of the proceeds, as charged in the Information, as detailed above.  Has Avasso given a rational explanation for his guilty plea when he was actually innocent?

In July, 2008 Avasso gave a factual basis for his guilty plea.  Avasso testified that he read the charge against him and that he was guilty of that offense.  (Tr. 7/11/08 at 31-32.) Avasso admitted that from approximately July 1998 to or about January 31, 2005, he conspired and agreed with Stephen Wahrman, Richard Goodhart, Charles Carus, and others to manipulate the price of securities and to conceal the ownership, control, influence, and proceeds from the sale of securities in APP and to utilize wire transmissions in furtherance of that scheme. (Id. at 32.)  Avasso also admitted that from approximately July 1998 through on or about August 24, 2005, he conspired and agreed with Charles Carus and others to engage in monetary transactions in criminally derived property, namely, the proceeds of the APP securities and wire fraud.  (<u>Id.</u>)

25

Avasso admitted that in furtherance of that conspiracy, on or about July 30, 1998, he, Stephen Wahrman, Richard Goodhart, and others agreed that APP would enter into a consulting agreement with Bristol Consulting.  (Id. at 32.)  Avasso testified that the consulting agreement was false and fraudulent because it indicated that Bristol Consulting would provide various services to APP when in fact Bristol Consulting did not provide any services to APP other than fund-raising.  (Id. at 32-33.)  Avasso then admitted that the purpose of the consulting agreement was to conceal the fact that APP was transferring free-trading shares of APP stock to him for his financial benefit.  (Id.)  Avasso also admitted that in furtherance of the conspiracy, from in or about May 2000 to in or about February 2005 he, Stephen Wahrman, Richard Goodhart, and others caused at least 4,129,800 shares of APP stock to be issued to Bristol Consulting pursuant to the consulting agreement.  (Id. at 34.)

Avasso testified that in furtherance of the conspiracy, he sold APP stock he acquired illegally to MC on January 10, 2001.  (Id. at 34.)  Avasso said he received $119,131.11 from MC in consideration for the APP stock.  (Id.)  Avasso admitted that he deposited the $119,131.11 into a bank account in the name Bristol Consulting at the State Bank of Long Island, an account he had opened on or about April 27, 2000.  (Id. at 33, 34.)  Avasso moreover admitted that he made the deposit of $119,131.11 knowing

that the transaction involved criminally derived property.  (<u>Id.</u>
at 34.)  Avasso explained that on or about January 11, 2001, he
wire-transferred $50,000 from the Bristol Consulting bank account
to a Fleet Bank account for the benefit of Charles Carus.  ( <u>Id.</u>
at 34.)  He further admitted to transferring an additional
$50,000 by check from the Bristol Consulting bank account to Rita
Avasso, his wife.  (<u>Id.</u> at 35.)

In response to the Court's inquiry about whether Avasso was
guilty of the offense charged, Avasso again responded, "Yes, your
Honor."  ( <u>Id.</u> at 35.)  The Court found that Avasso's guilty plea
was knowing and voluntary.  (<u>Id.</u> at 42.)

The principal reason given by the defense to explain why
Avasso took a contradictory position before this Court in the
Rule 11 hearing stems from the so-called threats by the FBI.  The
Court has carefully considered and rejected that claim as untrue,
as explained above in Part III. B. 1.  Secondly, the defense
claimed that prior counsel were ineffective and instructed Avasso
to just say yes and admit everything necessary to enter the
guilty plea, so Avasso admitted guilt when he was actually
innocent, due to counsel's advice.  The Court likewise rejected
that claim in Part III. B. 2, above.

While Avasso now tries a new tack of basically blaming
others and professing his ignorance of the illegal financial
activities swirling around him for years, this is a mere tactical

change rather than an explanation why he previously admitted guilt and now proclaims innocence.

Moreover, the admissions in his factual basis answers and in his plea agreement stipulations echoed evidence of guilt the government had independently gathered from interviews with other participants and review of documents.[5]  For example, as illustrated in the testimony of Special Agent Mesisca, the Defendant set up Bristol Consulting, installing his friend Sheldon Friedland as its president while concealing from the public his own controlling role due to his prior convictions and expulsion from the securities industry.  Friedland admitted as much in his testimony.  Avasso attracted would-be investors in APP through Bristol, and approximately $1.4 million passed into the Bristol account and was never sent to APP.  Avasso arranged the transfer of about $600,000 of the investors' funds from the Bristol account to an account in his wife's name for personal use of Mr. and Mrs. Avasso.  The IRS prepared a schedule of the Bristol Account's deposits and withdrawals during the relevant time period (Ex. G-6) reflecting these facts as derived from the

---

[5] The government summarized other evidence of Avasso's guilt of the offense charged, derived from interviews of co-participants and reviews of records, in U.S. Mem. in Opposition (Docket Item 23) at 17-21, as well as through the testimony of Special Agent Mesisca, which this Court fully credits.  As the case agent, Mesisca demonstrated a thorough command of the details and a credible demeanor in explaining why Avasso's new explanations don't line up with the facts of his participation and conduct in the illegal scheme.

actual documents.  Altogether the evidence showed that Avasso gained about $2 million from this scheme including from sales of APP stock sold to reimburse him for his "consulting services," while the market price of the stock was being manipulated by others.  The essence of his "consulting services" was to set up several additional corporations to funnel stock and money in exchange for non-existent consideration, together with his efforts to raise investment money which didn't find its way to APP.

The government amassed similar proofs with respect to the other companies Avasso set up including American Overseas Corp., (formed to attempt to fraudulently raise $5 million), Royce Anderson Monroe (controlled by Avasso, it paid a kickback of APP stock to a purchasing officer for North Shore Hospital to enter into a contract for "black box" devices that didn't work), Avigron Trading, Darrien Partners Investments, and Sampson Global, all of which had fraudulent consulting agreements that were used to get money from the sale of APP stock.  It suffices to say that the government's case rests on solid investigation and evidence gathered by the FBI and IRS, and not just upon the statements of Avasso that he now seeks to retract.  The testimony of Stephen Wahrman, a co-participant who has also admitted guilt in this scheme, confirmed these machinations and Avasso's role in them.

This motion is not a vehicle for weighing the new denials Avasso seeks to inject into the record.  His opportunity to try these tactics would have been at trial, which is a right he knowingly and voluntarily and explicitly relinquished.  His new explanations are patently contradicted, however, by the overwhelming evidence in the FBI and IRS investigation, and they do not present a just reason to set aside his plea of guilty.  He has not asserted, for example, that his theories of innocence were previously unavailable to him when he decided to admit his guilt, nor has he attempted to show that the evidence amassed against him was contrived or legally insufficient.

Confronted with sentencing and perhaps fearful of punishment, the Defendant has changed his mind about pleading guilty, without also demonstrating some just reason why he so thoroughly admitted his guilt to the conspiracy.  Such a change of tactics is not a reason for granting this motion, and neither is fear of punishment.  Jones, 336 F.3d at 252; Brown, 250 F.3d at 815; Jones, 979 F.2d at 318.  Having considered Defendant's profession of innocence, the Court finds a lack of plausibility as to his claims, coupled with an absence of any substantial ground for establishing innocence, or at least raising reasonable doubt as to the government's evidence, that was unavailable or not apparent to Avasso by the time he entered his plea of guilty in July, 2008.  These new proffers of innocence by Avasso, while

necessary to any relief from his guilty plea, are not sufficient to gain that relief under the circumstances presented here.

**D.    Whether the Government would be Prejudiced by Withdrawal of the Guilty Plea**

The Court must also consider whether the Government would be prejudiced by the withdrawal.  <u>Jones</u>, 336 F.3d at 252; <u>United States v. Sgarlat</u>, 2010 WL 1380254 *3 (D.N.J. Mar. 31, 2010). The United States claims that it geared down the investigation when the guilty plea was entered more than two years ago.  The prosecution also points out that the statute of limitations has been running as to uncharged co-conspirators.  Meanwhile, as in the <u>Sgarlat</u> case, <u>supra</u>, Mr. Avasso waited to seek to withdraw his plea until after the Probation Department disclosed the Presentence Investigation report, which also contained aspects of the investigation and proofs in these matters, disclosed by the Government to the Probation Office and the Defendant, that Avasso was not otherwise entitled to receive, all in reliance upon Avasso's plea of guilty.  See <u>Sgarlat</u>, 2010 WL 1380254, at *13 (omitting footnote).  The United States, if this matter were now set for trial, would be prejudiced by the disclosures, done for sentencing purposes, of what its trial roadmap would have been, in narrative form, complete with names or initials of many persons whom the prosecution would likely call against Avasso to prove delineated aspects of the case.  While the United States

31

need not show such prejudice when, as here, a defendant has failed to demonstrate that the other factors support a withdrawal of the plea, <u>United States v. Harris</u>, 44 F.3d 1206, 1210 (3d Cir. 1995), the United States has shown a degree of prejudice in its reliance upon Avasso's long-ago entry of his guilty plea.  This is another factor militating toward the denial of Defendant's motion under Fed. R. Crim. P. 11(d)(2)(B).

## IV.   CONCLUSION

For the above-sated reasons, the Court finds that Defendant Alfred P. Avasso has failed to show a fair and just reason supporting the withdrawal of his plea of guilty.  Defendant's motion will be denied and the accompanying Order will be entered.

**October 21, 2010**                    **s/ Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                          U.S. District Judge